GRANT, J.
The plaintiff in error was arrested, tried, convicted and sentenced, in the lower court, the charge against him being a violation of the following ordinance of the defendant city:
“Section 1343e. No load in excess of ten (10) tons in weight, including the weight of the vehicles, shall be propelled or driven upon or over the streets of the city, provided, however, that the director of public service may issue permits in special eases for the carrying of heavier loads upon or over certain streets specially designated in the permit. ” * * *
The sole assignment of error relied on here to work a reversal of this judgment of conviction and sentence, is that the city of Cleveland was without constitutional power to pass the ordinance in question; and this is so — it is said — because the ordinance is in plain and destructive conflict with the following statute law of the state of Ohio — the sections being those of the General Code:
“Section 7248. No person, firm or corporation shall transport over the improved public streets, highways, bridges or culverts within this state, in a vehicle propelled by either motor or muscular power, a burden, including weight of load and vehicle, greater than the following:
“In vehicles having iron or steel tires three inches or less in width a load of five hundred pounds for each inch of the total width of tire surface on all wheels. The provisions of this sec-vehicles exceed three inches in width an additional load of eight hundred pounds shall be permitted for each inch by which the total width of the tire surface on all wheels exceeds twelve iches;
“In vehicles having tires of rubber or other similar substance a load of eight hundred pounds for each inch of the total width of tire surface on all wheels. The provisions of this section shall not apply to iron or steel tire horse drawn vehicles when in use upon the streets or thoroughfares of cities or upon the streets and thoroughfares of villages, except such streets and thoroughfares therein as have been or may hereafter be improved by the state or county.
“Sec. 7249. No traction engine, trailer, steam roller, auto *495 mobile track or other power vehicle carrying a weight in excess of four tons, including weight of vehicle, shall be operated upon any of the improved public streets, highways, bridges or culverts within this state at greater speed than fifteen miles per hour, and no such vehicle carrying a weight in excess of six tons, including the weight of such vehicle, shall be operated upon any such a street, highway, bridge or culvert at a speed greater than eight miles per hour when such vehicle is equipped with iron or steel tires or at a speed greater than twelve miles per hour when such vehicle is equipped with tires of rubber or other similar substance.
‘ ‘ Sec. 7250. The weights of loads prescribed and the rates of speed mentioned in Secs. 7246 and 7249 inclusive of the G-. C. shall not be decreased or prohibited by any ordinance, resolution, rule or regulation of a municipal corporation, board of county commissioners, board of township trustees or other public authority.”
Inasmuch as the ordinance forbids that which the statute by not forbidding permits, we take it to be manifest that in this respect and to that extent the two are in conflict; and in view of the writ of prohibition served on the municipality by the last quoted section of the statute, we must conclude that the variance was premeditated and invited, and amounts to a challenge of the charter of the city, under favor of which the ordinance was passed.
Our present duty, therefore, is now owed to finding out which of these two repugnant enactments bears the image and superscription of Caesar; which of the two is in their conflict paramount? Which is the law.of the case? If the statute is so, then the accused was illegally convicted and the judgment should be reversed. If the ordinance is the law applicable, then the conviction was right and must stand.
This inquiry calls for a consideration of the charter of the eity of Cleveland.
The grant of power conferred on the latter by the Constitution of Ohio, is to be found in the Eighteenth Article of that organic instrument, adopted September 3, 1912, Sec. 3 whereof is as follows:
*496 “Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws. ’ ’
The seventh section of the same article is in the following-language :
“Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Sec. 3 of this article, exercise thereunder all powers of local self-government. ’ ’
Availing themselves of the permissions thus constitutionally accorded to them, the people of Cleveland adopted their charter and there is no doubt that it delegates to the city legislative authorities ample power to pass the ordinance in question, and to its executive power to enforce obedience to it, unless some superior source of jurisdiction may of right interfere and forbid it. So much, we think, will not be controverted.
The history involved in these provisions of the organic law of 1912 is too recent to require recitation, and so well known in its purpose and intendments, that we are not at liberty to ignore it and pass upon the issue at bar as if it had no history.
For some years prior to the revision of 1912, the limitations imposed by the constitution of Ohio on the powers of the people to order their own domestic and local affairs in their own way, had been severely felt and acrimoniously discussed throughout the state. It was felt that municipalities should have a free hand m administering laws appertaining to their police needs, without the interference constantly inspired by the legislature, made up of men in no way responsible to those whose concern they were all the while meddling with and whose plans for a better local government they were bringing to naught. The idea was embodied in the term “home rule,” and the agitation culminate.l in the convention of the year last mentioned.
It may with confidence be affirmed that the idea of local self-government was dominant in that body and its work, overtopping in interest and outcome all other considerations and resulting in what the framers of the revised instrument and the people back of them believed was the planting in it of their will in this *497 respect, beyond tbe power of the legislature to overturn, uproot or undermine. Their wish found expression in the provisions of the constitution just quoted.
Those provisions evidence the unquestionable public policy of the state, to be obeyed and respected accordingly by every means and all agencies charged with the duty of administering them in all integrity, by advancing the remedies furnished by them and enforcing all appropriate sanctions necessary to make them obeyed and effective. There is no reason to think that this policy has since become unsettled. It has been crowded from the front by dangers larger than those against which its business is to safeguard the common welfare — that is, a peril now looms higher on a wider horizon of immediate vision; but that it will resume its former importance as the exigencies of the present are met and pass from view, is not to be doubted, as we think. In any event, a retreat from this policy must, if at all, be sounded by the same power which commanded the advance, the people themselves, by constitutional means; the courts can not be drafted to the service of sappers and miners in overthrowing what the popular hands so laboriously and in the face of so much opposition built up.
Nor can the courts aid in the undermining process by indirection, by refining away the barriers of the constitution and sterilizing what the people planted as fruitful agencies for coming to their own.
There is reason to fear, if not to believe, that the average congregation at Columbus would be more than glad to resume its ancient function of governing Cleveland in matters solely of Cleveland concernment as well as that of the state, if the opportunity to do so were to be restored by the courts. The member from Poor-cuss township ordinarily esteems it a duty as well as a privilege to interfere and impose his own idea — perhaps the term is rather a strong one for him — or his whim, or his prejudice, on the numerous inhabitants and the large interests of cities as far beyond his range of mental vision as they are from his sequestered bailiu-ick. The statute, the paramountry of which is insisted on here, -was passed, at least as to its present i’mn, since the adoption of the constitutional provision and since *498 tlie Cleveland charter was framed in promotion of its permissive authority; the statute therefore in purpose can be regarded in no other light than as throwing down, deliberately, a challenge to the conflict between Cleveland and Podunk assembled at Columbus. If the challenger prevails, then a succession of such invitations to conflict with resulting victories each time, would end in sending the charter to the wall and the absorption in the State House of all the powers which the constitution and public policy of the state meant to reserve to, and concentrate in, the city hall, with all the abuses incident to such absorptive appetites. The result of the undermining process, if successful, would be to return to power the abuses of the old and evil time and reimpose them on the now free municipalities of the state with as firm a seat as the Old Man of the Sea had on the shoulders of Sinbad the Sailor. The long cherished and hardly won victory of reform in matters of domestic concern and local self-government, now crystallized and imbedded in the constitution, would be frittered away, and the dead and buried charter would deserve the epitaph which the late Gen. Schenck proposed for his bill, defeated by similar means — “Nibbled to death by pismires! ’ ’ Personally, I confess to having no sympathy with the end in view and no disposition to assist in the process by which it is proposed to reach it, except in obedience to a plain duty imposed by law and in clearing my oath of office.
To see whether judicial duty i*equires this reluctance— natural in the citizen having’ the principle of letting people order their own concerns in their own way, under law — to be overcome in obedience to the commands of a superior power, calls for an examination, somewhat critically — as its importance deserves— of this question of paramountcy now put in issue in such form as to require a categorical answer, which — no matter what becomes-of this judgment after it leaves its present field of review —must stand as the law of the case.
The conflicting nature of the two enactments involved in this inquiry, the statute and the ordinance, being admitted or found, the decisive underlying question arises, as we think, as to whether the things forbidden to be done by the latter, but within limits permitted to be done by the former, are so forbidden and *499 denounced by the ordinance as offenses to be punished, are so forbidden in the exercise of a power of local self-government under the charter of Cleveland, to the effect of taking them out of the inhibition arising from a conflict between the local law and a general law of the state, or what purports to be a general state law. For it will take more than a state law, general in terms and general in operation through the state'elsewhere than in charter governed municipalities, to work the effect of annulling the judgment of conviction before us. There must be a denial of the conclusion that the subject dealt with by the ordinance is a matter peculiar or appropriate to “local self-government,” within the contemplation of the article of the constitution with which this conviction has to do.
That inquiry being answered one way or the other, and one way or the other we shall be able to answer the question of paramountcy, upon considerations of both principle and authority, as we think.
If any matter more than another comes within the ordinarily conceived definition of local cognizance, if anything is to be thought as coming within the notion of “local police,” “sanitary,” or matters “similar” in scope and significance to these, that thing must be affairs which deal with, and concern a city’s streets. To say that a city must at its own proper peril keep its streets and ways open, practicable for safe travel, in repair and free from nuisance, and pay for any violation of this law-imposed duty, and yet have its control over those same streets under the supervision of a foreign authority, when by the organic law it is clothed with the right of exclusive dominion over things of local and domestic concernment, seems to us preposterous. To admit it would make the constitution in this most important respect self-destructive; it would permit the small political units of the state to dictate to the powerful cities their internal policies and to defeat those which would not measure up, or down, to the rural ideas of the backwoodsmen. It would open to the forces of intrigue and chicane, incarnate in a legislative lobby, the most vital interests of great bodies of people, representing "the opulent cities and emasculate the virility from governments which can be honest and efficient only when they are *500 brought frequently face to face with the governed and be made to account at each recurring election at the bar of the local masters. Such a st^te of affairs would reduce the theory of the new constitution to a governmental solecism, an absurdity and a standing invitation for home rule to commit hari-kari.
'We have no difficulty in finding tliát such is not a doctrine in consonance with, or permitted by the constitution of 1912.
Having thus concluded, any remaining inquiry is answered, we think, by a consideration of the footing upon which the court proceeded in Billings v. Cleveland Ry. 92 Ohio St. 478 [111 N. E. 155].
That case is referred to in the brief for the plaintiff in error here, where its application to the case in hand is denied. We think differently. It is inadequately reported, in the respect that the points relied on by counsel are not stated. But as the case was tried first in this court, we are quite familiar with the line of argument pursued. It was to the effect that as Euclid avenue was at a remote period in its history a state or county road and as such had been amenable to general Ohio law of state authority and making, and since the jurisdiction thus conferred had in no way been withdrawn, although by becoming a street of Cleveland that road had passed under city control as a concrete matter of administration, and because state laws required consents from abutting owners before the tracks of the defendant railway company could be laid in the avenue between East Twenty-second street and East Fortieth street, whereas the charter gave the right burdened by no such consents, the charter thus and thereby came in conflict with a general state law in that regard, and so was inoperative and void; such was the argument. The Supreme Court denied the contention. It found, first, that the right of the abutting owner to give or withhold consent, was not a property right.
No more, as we view the matter, has an Akron truck driver a property right to traverse the streets of a city other than his own, with truck overloaded to an extent incompatible, in the estimation of the city which is chargeable with the safety and upkeep of those streets with that safety, at his own will and pleasure, subject only to a state law, different in its permissive *501 use of streets and roads of tbe whole state from that which Cleveland has by ordinance seen fit to prescribe and limit.
Its further finding- was that the subject of the litigation, to-wit, the use and control of a street of Cleveland, was a subject which might be provided for by a charter adopted under the power granted by the home rule provision of the constitution now under consideration. Having proceeded thus far towards an ultimate solution of the question in hand, the court stated its corollary thus:
‘ ‘ Such consents are not property rights, but rights in their nature personal to each owner of an abutting lot.
“Such personal rights were bestowed by the general assembly on owners of abutting lots as a check upon the power of the municipality. The right referred to not being a property right (the taking of which would violate the guaranties of the constitution, unless done by due process of law and after full compensation), it follows that the statute conferring it, being a matter of local concern, when inconsistent with the provisions of the charter passed under favor of the constitution, would fall simply because it was inconsistent. ’ ’
Otherwise stated, when a state law undertakes to deal with a local affair, so far forth it becomes a matter of local concern itself, and coming in judicial collision with an ordinance constitutionally competent to prescribe exclusively the terms upon which alone that matter of local concern shall be exercised or controlled, the statute fails and the charter and ordinances passed in pursuance thereof become supreme. Both sources of authority, the city council and the state legislature, can not be dominant in the same field of jurisdiction. If two ride on the same horse, one must ride behind. Given the fact of inconsistency and the further fact that the matter is of local concern, the legislature retires and leaves the council the master. We have these' two postulated facts — a conflict and a subject of local concernment.
Obviously, to our apprehension, the same conclusion must follow. It would not be difficult, as we think, to reach the same result upon other avenues of approach, both upon the reason of the thing and adjudicated cases. But it is not deemed necessary to do so.
*502 It follows that of the two pieces of legislation, the ordinance as applied to this case, is paramount, and the claimed controlling force of the statute must be denied.
There are some other technical points raised by the reeord under review, but they are not insisted on, nor are they material.
There is no error apparent in the judgment complained of, and it is, therefore, affirmed.
Lawrence, J., concurs.
Dunlap, J., dissents.